We'll be hearing four arguments this morning. The first one, in Re Cree, Inc., Appeal No. 15-1365. Mr. Lee, whenever you're ready, you're reserving three minutes of rebuttal, right? That's correct, Your Honor. Thank you. And if by chance, due to a curious bench, we ask you a lot of questions, I promise you we'll restore your rebuttal time. Thank you. May it please the Court, my name is Bill Lee, and together with my partner, Sinead Vreeland, I represent Re Cree. I would like to turn to what we believe is the critical portion of the Board's decision at pages A29 to A32. There, the Board, on five occasions, predicates this decision on the proposition, and I quote, that there were two known approaches to producing white light from LEDs. And I would like to specifically draw the Court's attention to one specific use of that proposition, which is at A31 to A32. And there, the Board defines a person of ordinary skill in the art, and defines a person of ordinary skill in the art as the artist of ordinary skill who knew that there were two, and again, I quote, there were two known approaches to create white light from an LED. That is critical. All five iterations are critical, but this one, we think, is specifically critical because it is the definition of what one of ordinary skill in the art knew. We submit that there was not substantial evidence to support that second approach finding. In fact, we suggest and believe that there is no competent evidence to support that specific finding. The PTO- Does the Board need that finding in order to sustain this rejection? I ask that because, of course, this section of the opinion is focused on doing a treatment of your declarations that you submitted, and then the first 28 pages could arguably be read as reviewing and ultimately affirming the examiner's, I'll call it prima facie rejection of 103, based on the three references. Your Honor, I don't think so, because for two reasons. The first is the structure of the Board's opinion is, as you say, there is the first 20 or so opinions where they articulate the reasons they say they are affirming the examiner's decision. The five occasions that I have identified are before they reach the question of addressing Cree's arguments. They are defining the person of ordinary skill in the art. They are defining what is known by that person, and they are using that to provide a reason to combine the references. That's why the Board itself, the PTO itself in the brief before you, focuses on these because this was a lynchpin. There is, to be sure, an alternative argument that's being made to you now that I'm going to come to promptly, but it's not one that the examiner relied upon. The examiner's predicate was this, the one I've just articulated. It was the Board's premise, and we're in this circumstance now today. The PTO now has conceded that there's no prior art, none at all of record, that would support the proposition that it was a known approach to down-convert from an LED to obtain white light. That would be a Section 102, though, right? That would be an anticipation reference. Well, actually, Your Honor, here's what's actually happened. By defining the person or Board member's skill in the art, by saying that there were two known approaches, the second known approach is exactly what's in the claim. Basically, what the examiner and the Board has said is the invention was known, and then they found three prior art references to say this is how you would implement it. I guess, you know, I'm sorry. Go ahead. You go ahead. It struck me that the use of the term known may have been a little loose, but I take it from what Stringfellow was saying, that the gist of his characterization of where the art was, was that people would not have used this approach. There was nobody using it in the real world because of the lack of efficiency, the low power, and so forth. Not saying that it had never occurred to anybody that you could make white light or any other kind of light, which could be combined to make white light, from an LED. Now, if that's true, then maybe the word known, which is typically used as a term of art, is maybe an overstatement, but it didn't seem to me to get in the way of the basic analysis that the Board employed, which is to say that when you take Stevenson, you've got everything you need except to go from primary colors to white light, and that's trivial. Why isn't that a reasonable way to look at this case? Your Honor, I have three answers. The first answer is in the PTO's brief at page 24, and I'd like to quote to you, because it's not a question of known being sort of an introvert use at one point in the examiner's decision. It was used in the examiner's decision, it was used in the Board's decision, and after conceding that there's no prior art that identifies that known approach, and they never contend that Stevenson does. In fact- But Stevenson comes within a millimeter of being the invention, does it not? No. In other words, all that's missing that I can see from Stevenson is one sentence in which Stevenson could have said, of course, as everybody knows, having said that you could get all primary colors, as everyone knows, you could mix the primary colors by using a group of phosphors and you get white light. Isn't that the only thing that's missing? No, and actually, Your Honor, the last portion is conflating the two approaches. Without a doubt, without a doubt, Stevenson refers to producing primary colors. It also says the only colors that are going to be produced are those that are visible to the human eye. That's not white light. White light is fundamentally different because it's a different spectrum, it's generated in a different way, it's used for different purposes, and it requires different power. All of that is in the three declarations. The mixing of the three, the triplet approach- mixing the phosphors to get white light from a blue LED. Your Honor, if you have a violet LED in Stevenson, you have what you've just articulated, but I think without it, all three of the experts said white light is fundamentally different than the primary colors. Then you have 20 years, 20 years where, according to the PTL, people really want to have white light produced by LEDs. And Stevenson's out there and nothing happens. And that's the reason, you know, there's a reason that this known approach, analytical framework- Because it wasn't efficient. They didn't have a powerful enough LED until Nakamura came along, right? Your Honor, I might even- no one has even- there's not even any evidence to say that Nakamura was a powerful enough LED. The Pinnau laser was 100 times more powerful than the LED of Nakamura. Nakamura was still a weak LED until people could figure out what these inventors figured out. Weak in what respect? Pardon? Weak in what respect? Weak in terms of power, because- and power becomes important. So Nakamura, when it says in its patent that I'm getting a more powerful LED, that wasn't the truth. It was more powerful than other LEDs, but to compare it to Pinnau- More powerful than prior LEDs. Blue LEDs. It was more powerful than the Stevenson LED, the violet LED, for sure. Violet, but we're talking blue LEDs, not violet. The question is, would one of ordinary skill have been motivated to use a blue LED as the raw material to push through down conversion to get white light, right? And Your Honor, here's- If you look at blue LED as a raw material, like a form of gasoline, it's either low octane, high octane, whatever. So the way I read the record was that no one would have been using a blue LED as input material for down conversion if it didn't have enough octane. Low power in, low power out. And here comes Nakamura that has high tech. They've got, you know, premium gasoline. Premium blue LED. And what the record demonstrated, without any dispute, is when Nakamura invented his blue LED, what did the field do? It said, now we finally have all three primary colors. We're going to employ the triplet approach. Well, they continued using it, but I don't know why. Well, actually, the record demonstrates why. It's because down conversion requires significant power- results in significant power dissipation. White light requires, particularly for illumination purposes, compared to the primary colors, requires greater power. By definition, and this is in the record, the process of down conversion is power dissipating. The triplet approach is not. So once they had the three primary colors, they turned to the triplet approach. And there is no indication that anybody turned after Nakamura to the down conversion process. Did anyone ever come around to the process that your client owns? Why did it become commercially successful? People used it? I mean, finally the light bulb went off and somebody said, oh, my goodness? Your Honor, actually what happened is the triplet approach has some challenges, as the patent itself says. Now, that's the only thing in the record before the date of the application that describes the problem of the triplet approach. But you can imagine what it is. It has three different LEDs. It's going to require the combination. It requires three different contacts. The blue LED to white light requires one. It's simpler if you can make it work. Is it expensive equipment that you use? I mean, would you want to make certain that you'd fully depreciated your equipment before you stopped using it to use something else? No, that's not what happened, Your Honor. Nakamura was 1993, is that right? Yes, that's right. And your patent was like 1995, right? Date of invention, 1995. Date of application, 1996. Right. So it's not as if people were sitting around for eons after Nakamura without coming up with this as a commercial product. I mean, I'm not seeing that your argument that nobody went to this system after Nakamura has much force if Nakamura came so shortly before the actual invention. Well, Your Honor, I think two things. One is it would be one thing if you were identifying folks other than the inventors who came to the invention. But the record is completely devoid of anybody else turning to it. But more importantly— What about press releases from, I don't know, Fraunhofer or some other people who apparently pretty close in time were also coming up with this white LED based on the Nakamura blue LED?  Your team came up with it two years after they came up with it maybe four or five years after. It's not so clear to me that this whole time lag question is a driver towards patentability. Right, Your Honor. I think this is, to go back to where I started, and I think this is why this is important. We collectively could sit around and look at the records and decide how we might put them together. I think we could look at Stevenson, but I think the record is what we have to look at. And the record on Stevenson, if you take the three experts including Dr. Stringfellow, each of them said specifically that it was not known. A known approach was not to download from an LED to obtain white light. And I think— That's good, but the problem with the declarations, or at least Stringfellow and Red Wing, is I didn't see them ever specifically take on why it would or would not be obvious to use the Nakamura blue LED in the Stevenson process once the Nakamura blue LED came on the scene. What I saw was an extended devotion to just looking at the references in isolation and then pointing out all the missing claim elements from each of the individual references and then talking about how the triplet approach was the standard process. But I didn't see any discussion in the declarations showing here's why the RGB triplet approach is better than thinking about down-converting the Nakamura blue LED light. Actually, Your Honor, let me say two things. First, it's in there, and they actually talk about the triplet approach. The patent itself describes the problems with the triplet approach and why it's more difficult to implement, why it's more complicated, while you're dealing with three different spectral wavelengths. So it's actually in the patent itself, but it's also in the Wetzel, Red Wing, and Stringfellow declarations. To take Red Wing, as one of the people Your Honor mentioned, the quote is, no person of ordinary skill in the art would have used a down-conversion process to create white light. But wasn't Red Wing talking about – that was in the context of the Stevenson reference, which of course had those very low, low power blue LEDs in question. Yes, Your Honor. It wasn't talking about in the face of the game-changing, Nobel Prize winning blue LED invented by Nakamura. And Nakamura was several orders of magnitude stronger than Stevenson, right? And 10 magnitudes less than Pinow. Right, but unless you want to search light, I mean, there's going to be some utility, presumably, for lower light. Your Honor, I don't think – I mean, this is – What is the measure of magnitude between Stevenson and Nakamura? Isn't it 3,000 times? It's several orders of – it's orders of magnitude greater. It's like 0.002 to 1 milliwatt. And then you go from 1 milliwatt to Pinow. And that's like 3,200 times, something like that. That's pretty big. Yes. We're not suggesting that it's not. But what we are suggesting is this. There is a record before us, and there are conclusions that are made. If you look at the examiner's rejection at page 1233 in the record, there is language in there that seemed to me to be pertinent. Maybe it's not, but you can explain it. I don't know whether you have it or not, Mr. Lee, at 1233. The advantage, your expected beneficial result by the combination. We're talking about Nakamura's LED is more powerful than Steven's, provide more photons, down-converted, better light emission, as Wetzel, Red Wing, Stringfellow, Buretz, and Tischler all readily acknowledge. Therefore, there's an advantage or a beneficial result in using the high-powered brighter Nakamura. What's wrong with that rationale? There are at least several things wrong with it. The first thing – well, there are several things that I don't think would sustain the decision on an appeal,  but is this true, the examiner's telling the truth when he says that Wetzel, Red Wing, Stringfellow, Buretz, and Tischler readily acknowledge the proposition that the examiner just stated? No, it's not true because the second half of it is not something that they acknowledge, specifically brighter emissions for phosphorous. They didn't say that. I mean, to go to the second point, I'll make it very quickly. Part of the problem going to the examiner's answer and the PTO's reliance upon it, the backup argument is you could look at PIN-L and it would teach you to down-convert from any light source to white light. Talking about wavelength. Well, they actually say any light source is what the PTO says to you. About the top 495 nanometers. Sure, and Stevenson would have been within that wavelength. The violet light would have been about 4,100. So is that incorrect? Is it correct to read Stevenson to say that Stevenson is saying any raw material source you're using that has this particular wavelength will work in the process? Yes. That's okay. It's inaccurate. It's inaccurate because? They're actually attributing that to PIN-L, not to Stevenson. The PTO today is attributing the concept of any light source will do to PIN-L. Any light source in a particular wavelength. Any light source for a particular wavelength. There are two problems with that. The first is at A79, which is PIN-L itself, which specifically says it's using a laser light source. There's a fundamental substantive problem with it. There's also a procedural infirmity, which is we're in a circumstance now where the examiner has a long answer. The PTO adopts, the board adopts certain portions of that to make its conclusions. And then the PTO before you now relies upon portions that were not adopted by the board to make that argument. Well, if your argument is that the laser and the LED are fundamentally different in the sense that you don't necessarily have downconversion operating in essentially the same way, contrary to the findings of the examiner, that the downconversion process is essentially responsive to wavelength and power and nothing else, that seems to me inconsistent with, for example, the passages in the 175 patent that talk about a variety of sources, solid state devices that can be used, including both LEDs and lasers with this scheme. Your Honor, I think that the answer to that is you identified two of the conditions or two of the inputs, let's call it. One is power, one is wavelength, but the third is phosphors. And the portion of, without a doubt in the 175 patent, it says that there are a variety of phosphors that could be used to achieve this purpose. But it is the first two that makes them fundamentally different. The phosphors are going to be different, but to take just, and I'll make this point and then I'll say whatever time I have left. But that's what is the question. The phosphors may be different, but we have a very well, as far as I can tell from the record, a very mature art of picking phosphors for tuning to particular wavelengths of emission. And I'm hard-pressed to see why, particularly given PINAU and, in fact, given the reference in the 175 patent to the phosphor mix, I'm hard-pressed to see why it would matter whether it's a laser or an LED as the power source. Your Honor, I would set aside the 175 because I don't think it's correct to use the 175 as a mapping. Except the 175 is talking about off-the-shelf phosphors. For phosphors, we don't disagree, but that's not the basis of the Board's finding. But the Board and Examiner, I thought they were saying that there's a lot of different sources of blue light or to create white light. And you can down-convert various sources. One is PINAU. You can down-convert fluorescent lamps to provide white light. And then, you know, I don't see anything in the patent saying that it's very difficult to come up with the phosphor mix in order to down-convert blue light. In fact, it says, you know, it's readily easy to figure out any suitable amount of suitable materials without undue experimentation. I think I just quoted the specification there. The phosphor selection is not the focus of the argument we're making to you. The argument that we're making to you, and this will be the final thing, and I'll say whatever time I have left. You have three minutes of rebuttal. The argument is this.  It couldn't be clearer that one of the most foundational findings is that there was two known approaches. That's the language. And respectfully, I don't think it was inadvertent. It was used multiple times. That's what it told the public. The PTO has used it and said it multiple times. The only justification, there's no priority, they can say. They don't make the argument that Stringfellow takes you within a hair's breadth of being there. Stevenson. Stevenson, I'm sorry. They don't make that argument. The argument is that the person with organized skill in the art knew that there were two approaches. And that is the key. And there's nothing, if you actually look at the portions of the opinion and the paragraph cited in Stringfellow, Redwing, and Wetzel, they simply don't say that. But I understand this is the linchpin of your argument that the Patent Board's decision is predicated on this misstatement, at least in your view, that it was known in the art to downconvert blue light into white light. But what if we disagree with that argument of yours? And what if we see the Patent Board and examiner saying there was a known process to downconvert an LED to white light in Stevenson. Not to white light, sorry, to different primary colors. But that blue or violet LED was very, very weak. And then the Nobel Prize winning Nakamura blue LED came out on the scene. And it would be an obvious substitution to put in the relatively speaking much more high power blue LED of Nakamura into the disclosure of Stevenson's downconverting process. And then because it is so well known, at least by 94, 95, that using a chromaticity diagram, you could mix blue light with a downconverted radiation to create white light. We have your invention. What's your response now to that, assuming we disagree that the board necessarily had to rely on what you call a misstatement? Your Honor, our response is that's not what they said. Okay, but what if we put that to the side? No, I'm putting aside the first part. It's not even what they said as to the argument Your Honor just articulated. Because if you go to the portion of their opinion which is entitled reason to combine, where they acknowledge there needs to be a reason to combine, they give a reason to combine Stevenson and Nakamura. There is no reason to combine Pinow with the LED references. And when you go to the PTO's brief, they don't make the argument that you just articulated. Their argument is this. We can pick from the examiner's answer some paragraphs. And if you put those paragraphs together, you can conclude that Pinow teaches you that you can downconvert from any light source. So I think my bottom line answer would be if that's what's going to be articulated as a basis for invalidating a patent that has resulted in a $10 billion market, there ought to be a remand at the patent office so they can say that that's the reason and we can test that reason against the record. Okay, thank you. Thank you. Let's hear from the government. Let's see. We went over quite a bit there. Six and a half minutes. Let's give Mr. Warrick then 21 and a half minutes in case he needs it. Thank you, Your Honor. May I please the court? I'd like to start off by clarifying that, yes, indeed, the statements about the downconversion of blue LED light to white light was known not in the 102 sense, but in the sense of what was undisputedly known. One, downconversion with LED technology was known. That's Stevenson. Two, downconversion of blue light to white light was known. That's disclosed in PINAU, but the examiner also cited several other sources. A1166 to 1173 details those, notably the admitted prior art. Also undisputed is that Nakamura's LED was, in fact, a game changer in the LED industry. The declaration from Dr. Wetzel demonstrates that it is, as Your Honor pointed out, approximately 3,500 times more powerful than the Stevenson LED. Throughout the treatment of the three declarations, Springfellow, Red Wing, and Wetzel, in the board opinion, the board is consistently saying that at least these experts are admitting or conceding that it was known to convert blue or ultraviolet LED light to create white light. And I just didn't see any statement like that in any of the three declarations, in any of the three declaration paragraph sites that the board cites. I mean, I know you want to try to use building blocks to create some ultimate logical conclusion, but I just don't see it. Well, Your Honor, I'll admit that the declarations do not contain those exact words as you expressed. We maintain, however, it would be difficult to read those three declarations and not conclude that one of skill in the art would have known at least to try the down conversion approach. And this is because all of them- Okay, so now you're making an obviousness type argument, right? Well, this is an obviousness case, Your Honor. Yes, I know, but that's not exactly the statement that's reflected in the board's fact finding and how it read the declarations. I don't see the board saying after reading the three declarations, the declarants have essentially agreed that it would be obvious to try to use a blue LED to create white light through down conversion. Well, first of all, it is a reasonable reading. Some may disagree, but a reasonable reading of, for example, Dr. Wetzel's declaration, paragraph 15, A957, to say that it was known. Specifically what he says, down conversion of LED light- Is that paragraph 15? Paragraph 15. 957. Down conversion of LED light had been considered. And it goes on to say, but was discredited due to the loss of energy and light brightness during the down conversion process. The use of white light in typical applications, e.g. backlighting of monitors and televisions, requires a significant amount of power and brightness. But as Your Honors have already pointed out, none of the three experts fully grapple with the fact that Nakamura was so much more powerful than the prior art LED devices. In fact, Stringfellow and Red Wing avoid it altogether. Stringfellow only attacks Stevenson, and Red Wing's comments are specifically couched as prior to the 94-96 timeframe. Dr. Wetzel says, in that same paragraph, paragraph 15, he winds up that paragraph saying, one of skill would have been dissuaded in considering the approach that is ultimately the claimed invention here, down converting blue LED light to produce white light. It's a reasonable reading of that statement that implicitly the person of skill in the art knew of this approach but did not take it. It would be ineffective, not that it didn't exist. It may not be commercially viable. Perhaps no one had specifically done it due to the lack of a powerful enough LED. It simply cannot be overstated that Dr. Nakamura's Nobel Prize winning blue LED completely changed the game. Now, I think a good enough... I think one way of reading that is that Wetzel was implicitly saying, yeah, if people knew that they wanted to try to use a blue LED as the raw material with this particular process, they wouldn't do it. They wouldn't do it because the octane wasn't high enough in the gas, wouldn't drive the engine, so to speak. Not that they didn't know that there was that process out there. Isn't that your view? That is our view. It's implicit in what both of them were saying. They're just dancing around when they say that, well, yes, Nakamura, if this is the new recently introduced LEDs, they were not powerful. They emitted relatively little light. Little light compared to what? Compared to a laser, right? We don't know what they're comparing it to. I believe so, Your Honor. These are definitely very craftily worded declarations, and they're as important for what they don't say so much as what they do. They consistently say down conversion was known, but one of skill in the art would not have used it. They would have been dissuaded from using that. If we look to the reasons for that, they say, well, there just simply was not enough power. But they never say that Nakamura's blue LED did not have enough power to be practically useful or commercially viable. In fact, it's undisputed that it was. What do you say? I mean, we start off with Stevenson, which has an LED and down conversion using conventional phosphors to produce various primary colors. Now, what do you say about the argument that you can't combine PINAU with Stevenson because PINAU is a laser? This goes to the question that the examiner addressed saying the lasers and the LED are not different from the perspective of the phosphor because it's light at a certain energy level and a certain brightness, and that's going to produce exactly the same photons coming out of the phosphor. But other than the examiner saying it, what is your evidence that that's true? Well, the examiner went to great pains to explain that there were multiple references in the prior art, including PINAU, that would have pointed someone in this direction and stated that one of the most convincing ones was the admitted art in the 175 patent. Well, okay, we'll keep going. So if we look at the 175 patent, it identifies several sources of this blue-to-white down conversion in the prior art, and it goes on in column 7, this is A64, to note that this invention can be used with what it calls solid-state devices, including lasers, LEDs, electroluminescent devices. There's a whole list. It's on column 7, lines 45 through 54. Now if we turn two pages over, A66, the top of column 11, this is where the applicants have the opportunity to describe how do you pick your phosphors, how do you do the down conversion, keeping in mind that it could be any one of these light sources. And what do they say? They say that suitable materials for such purpose can be readily determined without undue experimentation to provide good white light emission of virtually any tint or hue, as well as a virtually infinite series of chromaticity for all visible hues. This court has precedent establishing that you cannot tell the public that this element of the invention is within the knowledge of the skilled artisan, and then turn around and say that that would not have been obvious at the time of the invention. Now a couple of points that... What about the argument which is floated? I don't know that it's a central argument, but it was floated in the briefs that the difference between the lasers and the LEDs, besides power, is that the breadth of the wavelength band. That the lasers are much narrower, more monochromatic than an LED. So a couple of things, Your Honor. One would be that there's also the fluorescent prior art, fluorescent lights. Those phosphors were developed by GE back in the 1930s. And there are also these other fields where people were able to adapt to the different conditions. PINAU itself says it places very few limitations on what kind of light source you would use, because there are so many known phosphors. And again, the patent itself says this could be used with any number of sources, including both LEDs and lasers. Which really, I think, cuts through this argument that somehow you would not look to the laser art. The wavelength is the wavelength. If you are below 4950 angstroms, whether it's an LED or a fluorescent light or a laser, the down-conversion principle still works. And where's... You're drawing that conclusion from, other than the examiner says it about 10 times. Certainly the examiner is fully persuaded that it's true. And it may be true as a matter of elemental physics, but is there anything other than the 175 reference that you called to our attention that establishes that basic point of physics? I'm not aware of anything in the record that says those specific words. But again, I think it would be difficult to read all of the art cited by the examiner on A1166-73, his conclusion on A1209, and not conclude that one of skill in the art would have known that this blue-to-white down-conversion process could be applied to various light sources or radiation sources. And therefore, once Nakamura introduced this 3500 times more powerful LED, one would have turned to what is the only other approach that anyone has discussed in this case for going from primary colors to white-white, which was down-conversion. KSR says when there are a finite number of options for meeting strong market demand and pursuing those options was within the skill and the art, then the invention would be obvious. And that's exactly what we have here. And contrary to Appellant's arguments, this motivation to combine the market demand was clearly articulated by the examiner and also by the board. I guess the other side is saying that yes, the Nakamura blue LED is relatively more powerful than the one that was being used by Stevenson, but nevertheless, it was still quite weak. And so therefore, maybe it would be obvious to use it in the triplet, which is in fact what happened at the time in the industry, but nobody would have thought to think that it would be worthwhile to use the Nakamura blue LED because number one, it's still not strong enough, and two, the down-conversion process ends up dissipating so much energy that you end up with an even reduced level of output. So if the question is would one of skill and the art have known without doubt that this is an approach that would work and be commercially viable, perhaps not.  And here we have the triplet approach, and we have this down-conversion technique, which was known but had been discarded pre-Nakamura. It's difficult to imagine a person of skill and the art not pursuing the down-conversion approach when you have a new light source that is so much more powerful than the Stevenson LED from the 1970s. What is the power rating of the Nakamura LED? Approximately one milliwatt. One milliwatt, right. And this is according to Dr. Wetzel. That was in paragraph 79 of Dr. Wetzel's declaration. Paragraph 22 of his declaration, he describes the Stevenson LED, performed some math to conclude that it was approximately 0.0002 milliwatts. So if you do the math again, as Judge Clevenger pointed out, we're left with an LED that's more than 3,000 times as powerful. What if, I guess as a legal matter, when we read through the declarations, we see that the declarations are saying maybe, in fact, at the time, down-conversion had been considered of an LED to white light, but it was impossible to make white light. And so nobody would really actually even consider it. And then that, in our view, doesn't match up very well with the Board's finding that it was, in fact, known to use an LED and down-convert it to produce white light. Then what we have here is perhaps an erroneous fact-finding for the Board. Do you think that would require us, because it's discussed for a number of pages, for us to have to remand the case for the Board to reconsider the rejection without using and discussing that erroneous fact-finding? You're right. It's hard to imagine how it could not be at least a reasonable reading of the declarations that this was possible. And I'd point you in particular to Dr. Wetzel's declaration, where he talks about the Stevenson LED. And he says, this was so weak, it would have been so challenging to produce white light. He doesn't say you could not do it. In fact, he says you would have to string together, I think, 17,500 of these to get what he described as the commercially useful amount of light. Perhaps fewer of them could be used. And he describes this as just not strong enough to be useful or commercially viable, which just isn't the point of the patentability inquiry. But it's implicit in the discussion in Dr. Wetzel's declaration that it could be done, at least that's a reasonable reading that should be affirmed under the substantial evidence standard. Right. But I guess the premise of my question is I'm taking it away from you. So then the next question is, is there a reading of the Board decision where it still can be affirmed for substantial evidence in light of all the other analysis and fact findings? Or, as the other side says, because it permeates throughout the entire Board opinion, it goes to the heart of the substance of the decision that we have to remand it to give the Board a second chance at considering that fact finding. Judge Smith, I understand your question correctly. If we were to assume that the Board was incorrect... Right. Is it a harmful error or is it a harmless error? I think we would argue harmless error. And the reason for that is that the declarations, even if they stated expressly that white light down conversion from a blue LED had been tried and failed because it was impossible, there's a critical deficiency with all three declarations in varying degrees, and that's the failure to grapple with the Nakamura LED. These statements in Stringfellow and Red Wing specifically carve out the time frame in which Nakamura's LED was introduced. And Wetzel acknowledges that it was introduced, states simply that it had relatively low power, presumably compared to Pinnell, but acknowledging that it was even more powerful than the Stevenson LED, but never grapples with whether or not that advent in the LED industry would have changed the conclusions that anyone would have had from the 70s through the early 90s. Mr. Lee's position, as I understand it, hinges on the proposition that no one out there in the white light-making business had ever tried to use a blue LED with down conversion. It just was a process that was unknown. Isn't that the way you're reading what he's saying? Part of it. I mean, I think the arguments that – I mean, isn't that where he's – it's not when the board says this was a known way to do things. It was known to use a blue LED input in down conversion to get white light. He says there's no support for that. So his view is that he wins. He's entitled to his patent because there's been – not that there's a remand. His view is he wins. So I thought he better be sure that if I were looking, if I didn't find somewhere in the prior art where somebody recognized that this process was available, it's just he didn't choose to use it because there was no good raw material. Right. So, again, what was undisputedly known was that you could use down conversion with LEDs. Also undisputedly known, you could down convert blue light to white light. And the bridge between those – At least in the laser context. Yeah, as well as the fluorescent context, electroluminescent context, and others identified by the examiner. That's PINAU. PINAU comes from teaching from PINAU. PINAU? PINAU is specifically the laser teaching. It's worth noting, though, that – Where is the blue light through? You said there was teaching to use blue light as an input? Correct. That is PINAU, as well as others. And where else? I guess are you – the background section of the 175 patent? The background section of the 175 is another source for that. Are there other sources besides those two, PINAU and background? There are other sources discussed by the examiner, A1166-73. He steps through those in some detail. That's disclosure of using blue light in down conversion? Correct. To produce white light. To produce – down conversion to produce white light, yes. That's what the patent's all about. The patent is – If that was known in the prior art, what am I missing? Well, if you're saying what are you missing in terms of the concepts being in the prior art, we agree they were in the prior art. It was obvious. These claims are very broad. We're missing something, because Mr. Lee is saying, I mean, there's something that is totally unknown. I mean, nobody – no person of ordinary skill in the art would have ever gone near this. Nobody knew about it. I guess specifically it's the use of a blue LED to produce the white light through down conversion. There's other sources of blue light and down convert it to produce white light. The question is, was the usage of a blue LED in 1996 a patentable advance?  And it's, of course, our position that it was not, particularly in light of the fact that the first commercially viable blue LED had just appeared on the market. And, in fact, evidence that others were pursuing this same approach shortly after the introduction of the Nakamura LED. Again, it is not our position that it was known in the 102 sense that someone had specifically taken a blue LED, down converted the radiation to white light. But it is our position that down conversion with LEDs was known. Down converting blue light to white light was known. Down conversion was the only other approach that's been acknowledged by the experts other than the triplet approach. And given the incredible market demand for white LED light, these finite options, and the admitted skill in the art to know how to use the phosphors to down convert to white light, it is very difficult to conclude that a skilled artisan would not have pursued this approach. What about the commercial success evidence, the licenses, the industry praise? So, on all of those there are... The board gave none of that any weight. Is that right? Well, specifically what the board did was say that it did not outweigh the strong prima facie case. And the board identified several problems, three notable ones. The industry recognition were self-serving statements by third parties. The context in terms of the licenses were not clear. And the commercial success data was generalized data that lacked a clear nexus to the claims that are at issue in this appeal. Okay. Thank you. Thank you. Now, Mr. Roark went over, so can we... I think Mr. Lee had three minutes, but can we just go with three and a half so we can be sure to balance that? It's a hard three and a half minutes. Please go ahead. I'll be very direct. The PTO said something that I think is very important to the analysis that wasn't articulated in the brief. He said that down conversion was known, Stevenson, but it was known and discarded 20 years before Nakamura. So the question becomes, you have an approach that's known and discarded. And there are two problems with where the PTO is today. One is they're relying upon it as a known approach for down converting from LEDs to white light. And they're very specific, Judge Clevenger. It is down converting from an LED to white light that it's the known approach. But they now have said, to the extent there was a suggestion of it, it was known and discarded. And... Just to be clear, the down conversion concept with respect to a single LED had been put away in a closet. But down conversion of blue light to white light in other ways, whether it's fluorescent lamps or lasers, that was well known and being used. And, Your Honor, I think the fact that there are all these other applications, all these other patents, that are going to down converting blue light for other purposes is an indication that the differences in the field are significant. And this known and discarded is particularly important because the PTO just suggested to you that there's nothing in the record about what happened after Nakamura. But if you go to A958, which is the Wetzel Declaration, we would just suggest, and we know the panel will do so, if you compare the known approach, and Judge Clevenger, to be completely precise, it's the known approach of downloading from an LED to white light. And then you look at the paragraphs that are cited. They don't support that proposition. And I'll give just two examples in my rebuttal time. If you go to page A958 and you go to paragraphs 16 and 17, there is both the question of what was in the prior art and the literature in paragraph 16 that predates the filing date, 1996. The PTO now concedes that there's no prior art describing that approach. Then paragraph 17 and what follows specifically addresses the post-Nakamura period. And then if I can turn you back to page to A431, which is the Stringfellow Declaration, to paragraphs 25 and 26. There is, as Judge Bryson suggested, in paragraph 25, his statement concerning what he knew to be in the field. But then he goes much further. And he goes to the direction that had been provided before the work of the inventors, the problems with down conversion. And it's not just power. And they then go on to discuss the differences between lasers or any of these other sources. We focus on lasers, Judge Chen, because PINAU, which is the core combination, is, in fact, a laser. So I think – Did Dr. Stringfellow anywhere mention the Nakamura LED light? I see him talking quite a bit about Stevenson. He does, Your Honor. I'm not sure it's in the pages that are in – actually, yes. If you go to A964. Okay. That's a different Stringfellow Declaration. Yes. Yes. But he does discuss it specifically. To close, I think we're in a circumstance where – however, we could have a disagreement as to how close Stevenson got. But 20 years before, Steven said what he said about primary colors and light that would be visible to the human eye. The three declarations say that that doesn't include white light. We don't disagree that PINAU said what it said about a laser which was much more powerful and it said specifically that it was relying upon a laser source. The question is, how did the PTO get to making this combination of those references? And at the end of the day, they did it in two ways, and we suggest neither is sufficient. The first way is this two known approaches. And once you decide that the approach of down converting from LED to white light was known, that is the invention. To answer your question, all you're doing with the references is implementing. And that is not supported by this record. If there is another articulation of the reasons to invalidate, then they should be articulated so they can be tested by us and also tested by you. Thank you very much. The case is submitted.